UNITED STATES DISTRICT COURT
EASTERN DISTICT OF MICHIGAN
SOUTHERN DIVISION

JAMMIE S.[1],

                Plaintiff,

v.

COMMISSIONER OF,
SOCIAL SECURITY,

                Defendant.
_____/

Civil Action No.: 24-10896

David R. Grand[2]
United States Magistrate Judge

**<u>OPINION AND ORDER ON CROSS-MOTIONS</u>**
**<u>FOR SUMMARY JUDGMENT (ECF Nos. 12, 15)</u>**

Jammie S. ("Plaintiff") brings this action pursuant to 42 U.S.C. § 405(g), challenging the final decision of Defendant Commissioner of Social Security ("Commissioner") that, as of October 31, 2018, she was no longer disabled under the Social Security Act (the "Act"), and thus no longer entitled to the Disability Insurance Benefits ("DIB") she had been receiving.  Both parties have filed summary judgment motions and consented to the undersigned as presider pursuant to 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73. (ECF No. 13).

For the reasons set forth below, the Court finds that the Administrative Law Judge's

---

[1] The Committee on Court Administration and Case Management of the Judicial Conference of the United States has recommended that, due to significant privacy concerns in social security cases, federal courts should refer to claimants only by their first names and last initials.

[2] The parties have consented to the undersigned exercising jurisdiction over all proceedings in this civil action pursuant to 28 U.S.C. § 636(c). (ECF No. 13).

("ALJ") conclusion that Plaintiff's disability ended on October 31, 2018, is supported by substantial evidence.  Accordingly, the Court will **GRANT** the Commissioner's Motion for Summary Judgment **(ECF No. 15)**, **DENY** the Plaintiff's Motion for Summary Judgment **(ECF No. 12)**, and **AFFIRM** the ALJ's decision pursuant to sentence four of 42 U.S.C. § 405(g).

## I.  Background

On September 26, 2008, Plaintiff was found to be disabled following an automobile accident that caused "spinal injuries and nerve trauma," and awarded benefits with an effective onset of March 21, 2005.  (PageID.124-28).[3]  Plaintiff was 28 years old at her onset date, and at 5'8" tall weighed between 180 and 240 pounds during the relevant period. (PageID.124-28, 70, 75, 108, 368, 704, 712, 799).  She completed high school and indicated that she attended some undergraduate education at the International Academy of Design.  (PageID.51, 158, 375).  Plaintiff worked in construction as a field technician prior to the onset of disability in 2005.  (PageID.74).  In the last ten years, Plaintiff has done some part-time work as a retail clerk and worked on the assembly line for Chrysler, but did not maintain consistent full-time employment in either position.  (PageID.73, 99).  Plaintiff now alleges continuing disability because "[her] back injury has worsened over time.  [Her] sciatica is now on both sides, with radiating pain, muscle spasms and intermittent weakness/numbness." (PageID.415; *see* PageID.211).

---

[3] Standalone citations to "PageID.___" are all to the administrative transcript in this case, which can be found at ECF No. 5-1.

On April 29, 2014, a disability examiner determined that Plaintiff continued to be disabled. (PageID.44, 131). But on August 14, 2019, a Disability Hearing Officer determined that Plaintiff was not disabled as of October 31, 2018. (PageID.146, 198-204).[4] She was 42 years old when her disability benefits were terminated. (PageID.198).

After the Disability Hearing Officer terminated her disability benefits as of October 31, 2018, Plaintiff timely requested an administrative hearing (PageID.211), which was held on October 14, 2022, before ALJ Kari Deming. (PageID.61).[5] Plaintiff, who was unrepresented, testified at the hearing, as did vocational expert ("VE") James Fuller. (PageID.61). In a written decision dated March 3, 2023, the ALJ found that Plaintiff is not disabled under the Act as of October 31, 2018. (PageID.44-52). On February 2, 2024, the Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner for purposes of this review. (PageID.27). The Appeals Council did, however, admit an MRI of Plaintiff's lumbar spine with contrast from 2023 into the record (PageID.31-36). Plaintiff filed for judicial review of the final decision on April 8, 2024.

---

[4] Plaintiff's disability benefits were terminated at the initial level on August 23, 2018 (PageID.144, 178, 133-143) and on reconsideration by a Disability Hearing Officer on August 14, 2019. (PageID.146, 198-204). Although the Disability Hearing Officer wrote that Plaintiff "ceased" to be disabled on August 23, 2018, disability benefits weren't terminated until October 31, 2018. (PageID.144, 146). The ALJ uses the date of October 31, 2018, as the date when Plaintiff was no longer disabled. (PageID.46 ("Medical improvement occurred on October 31, 2018…")).

[5] An earlier hearing was held on August 5, 2020 (PageID.89), but the case was remanded by the Appeals Council with instructions to the ALJ to conduct an evaluation of the opinion evidence using the rules prior to March of 2017, since the claim was filed before then. Specifically, the Appeals Council instructed the ALJ to "[g]ive further consideration to the evidence and specifically explain whether medical improvement has occurred," and to collect more evidence if needed. (PageID.168-70). Thus, the ALJ's operative decision issued on March 3, 2023, reflected the October 14, 2022 hearing that occurred after the remand. (PageID.42).

(ECF No. 1).

The Court has thoroughly reviewed the transcript in this matter, including Plaintiff's medical record, disability reports, and testimony as to her conditions and resulting limitations.  Instead of summarizing that information here, the Court will make references and provide citations to the transcript as necessary in its discussion of the parties' arguments.

## II.     The ALJ's Application of the Disability Framework Analysis

Under the Act, DIB is available only for those who have a "disability."  *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007).  The Act defines "disability" in relevant part as the:

> [I]nability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §§ 423(d)(1)(A).  Under the eight-step continuing disability review process for DIB recipients, the ALJ must determine at Step One whether the claimant engaged in substantial gainful activity at any time after the onset date; at Step Two, whether the claimant has an impairment or combination of impairments that meets or medically equals a listed impairment; at Step Three, whether the claimant experienced medical improvement; at Step Four, whether the medical improvement was related to the claimant's ability to do work; at Step Five, whether an exception to medical improvement applies; at Step Six, whether the claimant's current impairments in combination are severe; at Step Seven, whether the claimant can perform her past relevant work in light of her current

residual functional capacity ("RFC"); and at Step Eight, whether the claimant's RFC allows her to perform other work existing in significant numbers in the national economy. *See* 20 C.F.R. § 404.1594(f). "[T]he Commissioner bears the burden of proof at each of these steps." *Delacotera v. Berryhill*, No. 3:16-cv-01464, 2017 WL 971935, at *3 (M.D. Tenn. Mar. 14, 2017). "There is no presumption of continuing disability," and "[i]nstead, the Commissioner applies the above procedures to determine whether the claimant's disability has ended and if she is now able to work." *Reeves v. Comm'r of Soc. Sec.*, No. 1:13-cv-325, 2014 WL 2434112, at *3 (S.D. Ohio May 29, 2014), *report and recommendation adopted*, No. 1:13-CV-00325, 2014 WL 2773258 (S.D. Ohio June 19, 2014) (citing *Kennedy v. Astrue*, 247 F. App'x 761, 764 (6th Cir. 2007)).

Following the eight-step sequential analysis, the ALJ found that Plaintiff was not disabled under the Act. At Step One, the ALJ found that Plaintiff has not engaged in substantial gainful activity "through the date of this decision." (PageID.44-45). At Step Two, the ALJ found that Plaintiff has the following medically determinable impairments: "degenerative disc disease of the cervical, thoracic, and lumbar spine, and degenerative changes of the bilateral knees," but that since October 31, 2018, Plaintiff's impairments, whether considered alone or in combination, do not meet or medically equal a listed impairment. (PageID.45). At Steps Three and Four, the ALJ determined that "medical improvement occurred on October 31, 2018" that is "related to the ability to work because it resulted in an increase in [Plaintiff]'s residual functional capacity." (PageID.46). Step Five did not apply in this case because it only applies if the Plaintiff's "impairment(s) has not medically improved," in which case the ALJ must "consider whether one or more of

5

the exceptions to medical improvement applies." 20 CFR 404.1594(a). At Step Six, the ALJ determined that since October 13, 2018, Plaintiff has continued to have the following severe impairments: "degenerative disc disease of the cervical, thoracic, and lumbar spine, and degenerative changes of the bilateral knees," which "cause more than minimal limitation in the claimant's ability to perform basic work activities." (PageID.46).

At Step Seven, the ALJ assessed Plaintiff's residual functional capacity ("RFC"), concluding Plaintiff had the RFC to "perform the full range of light work as defined in 20 CFR 404.1567(b)." (PageID.47). The ALJ then concluded that, at all relevant times, Plaintiff has been unable to perform past relevant work. (PageID.51). At Step Eight, the ALJ concluded, based in part on the VE's testimony, that Plaintiff can perform a significant number of jobs that exist in the national economy. (PageID.51-52). As a result, the ALJ concluded that Plaintiff, as of October 31, 2018, is not disabled under the Act. (*Id.*).

The Court has thoroughly reviewed the transcript in this matter, including Plaintiff's medical record, function and disability reports, and testimony as to her conditions and resulting limitations. Instead of summarizing that information here, the Court will make references and provide citations to the transcript as necessary in its discussion of the parties' arguments.

### III.    Standard of Review

The District Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). Judicial review under this statute is limited in that the court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has

made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal citations omitted). The phrase "substantial evidence" is a "term of art …." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (internal citations omitted). "Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains 'sufficien[t] evidence' to support the agency's factual determinations." *Id*. (internal citations omitted). "And whatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence … is 'more than a mere scintilla.'" *Id.* (internal citations omitted). Specifically, "[i]t means – and means only – 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (internal citations omitted).

When reviewing the Commissioner's factual findings, the court is limited to an examination of the record and must consider the record as a whole. *See Bass v. McMahon*, 499 F.3d 506, 512-13 (6th Cir. 2007); *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). The court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council," or in this case, the ALJ. *Heston*, 245 F.3d at 535; *Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). There is no requirement, however, that either the ALJ or this court discuss every piece of evidence in the administrative record. *See Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all evidence without directly addressing in his written decision every piece of evidence submitted by a party.") (internal quotations omitted). If the Commissioner's decision is supported by substantial evidence, "it must be

7

affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion."   *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (citations omitted).

### IV.   Analysis

#### A.   *The ALJ's RFC Finding is Supported by Substantial Evidence*

In her decision, the ALJ concluded that medical improvement occurred on October 31, 2018, and, since that time, Plaintiff has had the RFC to perform the full range of light work.  (PageID.50-51).  Plaintiff, on the other hand, argues that her "impairments are chronic, progressive, and severe," especially the "[m]ulti-level stenosis, cord impingement, annual tears, and radiculopathy," which "have worsened over time despite conservative treatment."  (ECF No. 12, PageID.983).  Plaintiff also argues that the need for "[s]urgical intervention… demonstrates the permanence and severity of [her] impairments."  (*Id.*). While the Court recognizes that the May 7, 2018 MRI of Plaintiff's back reflected some severe findings, for the following reasons, the Court nevertheless finds that the RFC is supported by substantial evidence.

Plaintiff draws the Court's attention to multiple pieces of evidence that she attaches to her motion, all of which are also in the transcript.  However, particularly in light of the deferential review standards discussed above, *supra* at 6-8, none of these permit the Court to disturb the ALJ's conclusion that Plaintiff can perform "light work."  First, Plaintiff attaches the MRIs of her cervical, thoracic, and lumbar spine from May 7, 2018, which show the "[m]ulti-level stenosis, cord impingement, [and] annual tears" that Plaintiff argues "prevent any sustained gainful employment."  (ECF No. 12, PageID.983, 988-93,

998-1003; PageID.594).  While this MRI clearly reflects some severe medical findings, in evaluating the ALJ's RFC, what matters is not the mere existence of such findings, but the extent to which they limit Plaintiff's functional abilities.  *Chizamonique W. v. Comm'r of Soc. Sec.*, No. 25-10252, 2025 WL 4686734, at *7 (E.D. Mich. Dec. 1, 2025) ("An impairment does not automatically necessitate a limitation in the RFC." (citing *Dukes v. Comm'r of Soc. Sec.*, No. 10-436, 2011 U.S. Dist. LEXIS 105526 at *16, 2011 WL 4374557 (W.D. Mich. Sept. 19. 2011) quoting *McKenzie v. Comm'r of Soc. Sec.*, No. 99-3400, 2000 U.S. App. LEXIS 11791, 2000 WL 687680 at *5 (6th Cir. May 19, 2000) ("[T]he mere diagnosis of an impairment does not render an individual disabled nor does it reveal anything about the limitations, if any, it imposes upon an individual.")); *Despins v. Comm'r of Soc. Sec.*, 257 F. App'x 923, 930 (6th Cir. 2007) ("The mere existence of ... impairments ... does not establish that [the plaintiff] was significantly limited from performing basic work activities for a continuous period of time."); *Blacha v. Sec'y of Health & Hum. Servs.*, 927 F.2d 228, 230 (6th Cir. 1990) ("The ALJ did find objective medical evidence of an underlying condition: nerve root compression in the cervical spine due to a herniated disc, as well as degenerative changes in the cervical spine. But there is little or no objective medical evidence tending to confirm that the pain attributed to this condition is disabling.").

And, as the ALJ explained, in May 2018, Plaintiff's "physical examinations showed that [she] maintained full 5/5 muscle strength throughout, and intact sensation." (PageID.48, citing PageID.605 ("Muscle strength is 5/5 throughout.  Sensation is grossly intact throughout.").  A few months later, in August of 2018, Plaintiff saw Dr. Karnik, who "identified no physical limitations at the time of the examination (B10F/8)."  (PageID.48,

9

citing PageID.632).  While the ALJ did impose limitations in the RFC, she explained why

Dr. Karnik's evaluation did not support the severe limitations associated with a finding that

Plaintiff continued to be disabled:

> The claimant complained of back pain that was worse with bending, twisting, and lifting, but reported that her symptoms did not limit her activities (B10F/6). Her physical examination showed decreased range of motion in the claimant's spine, and crepitus in both knees (B10F/7). However, she had normal range of motion in her neck, shoulders, and hips, a normal (but slow and shuffling) gait and station, and intact sensation. She was able to walk on heels and toes, and tandem walk (B10F/5, 7). She demonstrated normal 5/5 grip strength (B10F/5). Dr. Karnik identified no physical limitations at the time of the examination (B10F/8).

(PageID.48, citing PageID.629-32).

The ALJ's discussion is well-supported by the visit notes from Dr. Karnik's exam

on August 7, 2018.  At least according to the exam note, Plaintiff reported to him that her

back pain "does not limit activities."  (PageID.630).  Dr. Karnik wrote that Plaintiff had a

"normal gait and normal station," with a "normal exam" for tandem, toe, and heel walking,

and a "normal" range of motion in all joints.  (PageID.631).  Also cited by the ALJ and

attached to Dr. Karnik's exam is a physical evaluation completed on the same day and by

the same practice as Dr. Karnik's, but by a physician who can't be identified because his

signature is illegible.  (PageID.626-29).  This report found that Plaintiff had a "slow

shuffling gate," but that "clinical evidence" did not "support the need for a walking aid."

(PageID.629).  The same report also showed that Plaintiff had 5/5 grip strength and full

range of motion in both upper extremities.  (PageID.626-29).

Moreover, as a result of the May 2018 MRI results, the ALJ wrote that Plaintiff's

"doctor recommended that the claimant start physical therapy and follow up with epidural injections if needed," but as of "August 2020, the claimant had not participated in physical therapy and had not had any injections."   (PageID.48, citing PageID.622 ("I am recommending to start physical therapy on both her neck and back. If these have not improved, then I would recommend her see a pain doctor for epidural steroid injections."; PageID.693 ("Patient is not participating in physical therapy at this time… Patient has not had any injections or surgeries for this problem. Patient is not taking any NSAIDs for pain.")).

The ALJ also found persuasive the opinion of Dr. Myung Ho Hahn, MD ("Dr. Hahn").  (PageID.50).  Dr. Hahn performed a consultive evaluation of Plaintiff's medical records in November of 2018 and found that she could "lift and/or carry" 20 pounds "occasionally" and 10 pounds "frequently."  (PageID.636).  Dr. Hahn also found that Plaintiff could "[s]tand and/or walk (with normal breaks) for a total of about 6 hours in an 8-hour workday" and had "unlimited" ability to "[p]ush and/or pull (including operation of hand and/or foot controls)." (*Id.*).  Although Dr. Hahn's opinion merely refers to the MRI, the ALJ explained that it was consistent with the other medical records, citing Dr. Karnik's examination above and exams from 2020 that similarly showed Plaintiff had 5/5 strength in the "bilateral upper extremities" and "bilateral lower extremities."  (PageID.50, citing PageID.631, 668, 685).  Thus, despite some troubling MRI results in May 2018, Plaintiff's physical examinations substantially support the ALJ's conclusion that she could do "light work" beginning in October of 2018.

Throughout 2020, just as throughout 2018, Plaintiff's physical examinations

support the ALJ's conclusion that Plaintiff could do "light work."[6]  Plaintiff attaches to her motion an MRI of her lumbar and cervical spine and her right knee from May 13, 2020 (ECF No. 12, PageID.984-85, 987, 1026), but these don't support a more restrictive RFC than what the ALJ found.  The ALJ explained that the "MRIs of the claimant's knees identified cysts in both knees and mild degenerative changes, but showed no meniscal tears."  (PageID.49, citing PageID.670, 672 ("collateral ligaments are intact…No discrete meniscal tear is identified…. No acute fracture or dislocation… no significant muscle injury.  The visualized portions of the tibial and fibular nerves appear within normal limits.  Mild degeneration of the medial meniscal body.").  The ALJ also recognized that the MRIs of Plaintiff's lumbar and cervical spine from May 2020 showed some "bulging discs" and "generative disc disease," but that there was no more than "mild to moderate foraminal narrowing" and "minimal to mild disc bulging."  (*Id.*, citing PageID.676 ("Minimal left foraminal narrowing… Minimal disc bulging.  No significant neural encroachment… Mild foraminal narrowing on bilaterally."); PageID.674, ("small disc herniation" and "[n]o acute fracture.")).

Crucially, notwithstanding the MRI findings, the ALJ noted that physical examinations from the same period supported her conclusion that Plaintiff could do "light work."  For example, during Plaintiff's May 2020 visit to Dr. Radden, part of which is also included in Plaintiff's exhibits (ECF No. 12, PageID.986), her physical examination "showed tenderness, muscle spasms, and decreased range of motion in her lumbar spine,"

---

[6] As the ALJ notes, Plaintiff "presented no records showing that she received medical treatment during 2019." (PageID.48).

but Plaintiff "continued to display full 5/5 strength in her bilateral lower extremities, intact sensation, and a normal gait with 'no limp.' [] She also showed normal range of motion in her cervical spine, full 5/5 strength in her bilateral upper extremities, with intact sensation, and negative carpal tunnel testing. [].''  (PageID.48, citing PageID.667-68 ("Lumbar range of motion decreased… Neurological exam is 5/5 in the bilateral lower extremities with hip flexors, quadriceps, tibialis anterior, EHL and gastroc/psoas complex," Right Knee Examination: "Strength testing is 5/5 in all muscle groups tested," Cervical Spine Examination: "Patient has normal rotation and lateral bending of the cervical spine. Neurologic exam is 5/5 in the bilateral upper extremities with deltoid, biceps, triceps, wrist flexors, wrist extensors, finger flexors, finger extensors and intrinsics.")) (internal citations omitted).

Nor do the other documents from 2020 that Plaintiff includes with her motion suggest that Plaintiff's RFC should be more restrictive than determined by the ALJ. Plaintiff includes with her Motion the "Treatment Plan" notes and the "Injection Procedure Scheduling Form" from a visit with Dr. Radden on July 9, 2020.  (ECF No. 12, PageID.1025, 1027, 1034; PageID.695, 678).  Despite Dr. Radden's suggestion that Plaintiff receive multiple "epidural steroid injections," "medical branch blocks," and "to begin physical therapy," the ALJ noted that "[a]s of August 2020, the claimant had not participated in physical therapy and had not had any injections."  (PageID.49, citing PageID.684 ("Patient is not participating in physical therapy at this time... Patient has not had any injections or surgeries for this problem. Patient is not taking any NSAIDs for pain.")).  The record reflects that Plaintiff did not get any injections until August 2021,

13

when she "underwent cortisone injections in her left shoulder." (PageID.49, citing PageID.735).

Also in August of 2020, despite not receiving injections or starting physical therapy, the ALJ noted that Dr. Radden's "physical examination showed that she had tenderness in her neck, back, right shoulder, and right hip. However, she had full range of motion in her hips, full 5/5 strength in her bilateral upper and lower extremities, normal range of motion in her neck and shoulders, negative straight leg raises, intact sensation, and a normal gait." (PageID.49, citing PageID.685 ("Hip range of motion is normal. There is a negative straight leg raise. Neurologic exam is 5/5 in the bilateral lower extremities…[N]o sensory deficits in the L1 to S1 distribution [or C5 to T6 distribution]. Gait is normal… Neurologic exam is 5/5 in the bilateral upper extremities…")). The ALJ also noted that Plaintiff's "doctor again recommended physical therapy," which is clearly a conservative treatment plan that supports the ALJ's ultimate decision. (PageID.49, citing PageID.686 ("A course of physical therapy was recommended three times a week for six weeks.")).[7] *Rudd v. Comm'r of Soc. Sec.*, 531 F. App'x 719, 725 (6th Cir. 2013) (conservative treatment is a valid consideration when assessing a claimant's RFC).

---

[7] The Court notes that Dr. Radden also wrote in the "Treatment Plan" section of the August 2020 visit notes that "Patient is receiving opiates for severe and debilitating chronic pain relief. Alternative modalities such as NSAIDS, non-opiate analgesics, physical therapy, massage, etc., are being used in conjunction with opiates. Alternative modalities alone have failed to provide adequate relief." (PageID.686). However, Plaintiff's use of opiates is not reflected anywhere else in Plaintiff's medical record, the ALJ's decision, or the Plaintiff's brief. Furthermore, as Dr. Radden wrote at the top of the patient note, "Patient is not participating in physical therapy at this time… Patient is not taking NSAIDs for pain." (PageID.684). At her hearing, Plaintiff did state that she was on "Motrin 800… but no narcotics. I don't take narcotics." (PageID.82). Thus, noting about this issue calls into doubt the ALJ's analysis.

14

Plaintiff also includes the first page of a physical therapy request form signed by Dr. Bagley on September 11, 2020.  (ECF No. 12, PageID.1024; PageID.696-97).  The form directs physical therapy treatment in the form of "Hot/cold packs" and "Ultrasound" to treat "bilateral shoulder and right hip and right knee."  (ECF No. 12, PageID.1024; PageID.696).  Although Plaintiff asserted at her hearing in front of the ALJ that, as part of treatment for her back, she's "had injections, ultrasound therapy, traction therapy… physical therapy" (PageID.81), the transcript contains no physical therapy records.  As detailed above, Plaintiff's physical examinations throughout 2020 consistently demonstrate 5/5 strength in upper and lower extremities, full range of motion, and conservative or no treatment for pain, all of which support the ALJ's conclusion that Plaintiff can perform the full range of "light work."

The ALJ also noted that, in August of 2021, Plaintiff "injured her left knee while working out," and that "August 2021 x-rays showed only 'minimal' suprapatellar bursa knee joint fluid with 'no abnormality' in any of the three knee compartments." (PageID.49, citing PageID.871 ("Minimal suprapatellar bursa knee joint fluid. [] No abnormality is seen in any of the 3 knee compartments.")).

Next, Plaintiff directs the Court's attention to the "2022 physical evaluation" which, along with Dr. Eltahaway's opinion in 2013, Plaintiff argues "directly link MRI findings to chronic pain, radiculopathy, and functional limitations."  (ECF No. 12, PageID.982).[8]

---

[8]  Plaintiff does not clarify the "2022 physician evaluation" to which she refers.  Plaintiff writes elsewhere in her Motion that "Exhibit C" is the "10/27/2022 Treating Physician Office Note," but there are no records from 2022 attached to her Motion.  Therefore, the Court assumes this is a reference to her October 27, 2022 visit at Henry Ford Hospital with Dr. Christopher Mark

This argument lacks merit.  First, the evaluation by Dr. Eltahaway did not need to be considered because it was from 2013, which was five years before the ALJ determined that Plaintiff was no longer disabled and even before the 2014 decision that last found Plaintiff to be disabled.  As the ALJ explained in regards to the "State agency physical and mental functional capacity assessments from 2014," records from 2014 "were completed approximately four years prior the period that is under consideration, and do not describe the claimant's current functional limitations and capabilities.  Accordingly, they are given no weight in assessing the claimant's current residual functional capacity."  (PageID.50).  Although the ALJ doesn't specifically mention Dr. Eltahaway, the same reasoning clearly applies to Dr. Eltahaway's opinion in 2013.[9]

Second, although Plaintiff argues that the "2022 physical evaluation directly link[s] MRI findings to chronic pain, radiculopathy, and functional limitations," the evidence demonstrates the opposite.  The ALJ wrote that the October 2022 examination "showed that the claimant displayed normal muscle tone, with full 5/5 strength in her bilateral upper and lower extremities, and normal sensation."  (PageID.49, citing PageID.704, 724 ("Strength 5/5 strength throughout including shoulder abductors, elbow flexors, wrist extensors, finger abductors, hip flexors, knee extensors, ankle dorsiflexors.  Single leg heel lifts x5 bilateral and equal.")).  The October of 2022 visit note also indicates that Plaintiff's back pain has been "[r]elieved with stretching/yoga; had prior lower back injections in the

---

Andriano, D.O., ("Dr. Andriano").  (PageID.702-07).

[9] The ALJ's reasoning for not considering the state agency opinions from 2014 also applies to the two pages Plaintiff includes in her motion from visits in 2014.  (PageID.995, 994)

16

past with significant relief" and the doctor "recommended regular physical therapy." (PageID.703). The ALJ also cited to Plaintiff's evaluations in September of 2022, writing in the RFC that while Plaintiff complained of "right sided shooting pain," "intermittent numbness," and a "burning sensation in her right foot… an October 2022 electromyography (EMG) nerve conduction study of her upper and lower extremities was 'normal' with no evidence of radiculopathy, mononeuropathy, or polyneuropathy (B17F/9. 26)." (PageID.46, citing PageID.708, 726 ("This is a NORMAL electrodiagnostic study.")). Just as in September 2022, the evaluating doctor in October of 2022 recommended physical therapy, and wrote that they "[m]ay consider epidural injection if failure to gain relief from aforementioned interventions." (PageID.706). Although Plaintiff suggests that "[s]urgical intervention… has been recommended," surgery has not been the primary suggestion of any treating physician. Rather, the suggested treatments have consistently included physical therapy and injections.

Ultimately, as explained by the ALJ, Plaintiff's "light work" RFC is supported by her examinations in which she "regularly exhibits full 5/5 strength in her bilateral upper and lower extremities, normal 5/5 grip strength, and a normal gait in spite of her impairments." (PageID.49-50, citing PageID.629 (Dr. Krasik's August 2020 examination), 668 (Dr. Radden's May 2020 examination), 685 (Dr. Radden's August 2020 examination), 704 (October 2022 examination), 724 (September 2022 examination)). As discussed above, the ALJ considered the salient physical examinations as part of the RFC determination, and her analysis is supported by substantial evidence.

In addition to the physical examinations discussed above, the ALJ relied on

17

Plaintiff's own testimony that she had "worked part -time during much of the period that she is alleging disability. She has also continued to perform a number of other activates [sic] that are consistent with basic work functions including driving a car, making meals, doing light housework, going shopping, and managing finances."  (PageID.50, citing PageID.420-23 (Plaintiff shops "in store" and "[b]y computer" for "[g]roceries, household supplies.  She can "[d]rive a car" and "go[es] outside several days a week.")).

Finally, although the Appeals Council denied further review, it entered into the record an MRI of Plaintiff's lumbar spine conducted on May 24, 2023.  (PageID.33-36). While the Court "may not uphold, modify, or reverse the decision of the ALJ based on evidence submitted first to the Appeals Council where the council declined to review the case on the merits [] …The court may remand the matter for further administrative proceedings in light of the evidence, however, if the plaintiff establishes that it is new and material and that there is good cause for his failure to present it in the original proceeding." *Thompson v. Apfel*, 199 F. Supp. 2d 798, 814 (W.D. Tenn. 2001), *report and recommendation adopted* (Mar. 27, 2001) (internal citations omitted).  Certainly, Plaintiff could not have presented this evidence to the ALJ, because the MRI was performed after the ALJ issued her decision.  Regardless, Plaintiff does not discuss this evidence, let alone establish that it is "material."  Moreover, the findings in the 2023 MRI do not differ significantly from the findings in any of the previous MRIs.  For example, the two main findings in the 2023 MRI are "1. Disc herniations, narrowing the right neural foramen and left lateral recess at L5-S1, with mild left S1 nerve root mass effect. 2. Disc bulge and spurring with moderate bilateral neural foraminal narrowing at L4-L5." (PageID.34).  But

18

Plaintiff's MRIs in 2018 already showed a "mild bulging of the disc" at L4-5 and "moderate to severe right and mild-to-moderate left-sided foraminal stenosis," as well as a "4mm central/left central herniation" at L5-S1 causing "mild bilateral foraminal stenosis." (PageID.598-99).   And following her May 2018 MRIs, her physical exam showed Plaintiff's "[m]uscle strength is 5/5 in bilateral upper extremity and lower extremity." (PageID.622-23).   The MRI in 2020 also showed "bulging discs at L4-5 and L5-S1 and flattening of the thecal sac at L4-5, but no more than moderate foraminal narrowing," (PageID.49, citing PageID.674).   In short, despite the MRIs, Plaintiff's physical examinations provide consistent support for the ALJ's conclusion that Plaintiff could perform "light work" during the period in question.

### B.   *Substantial Evidence Supports the ALJ's Step Two Finding*

Plaintiff argues that the ALJ "improperly disregarded objective MRI evidence," which "documented impairments caus[ing] functional limitations consistent with SSA Listing 1.15 (cervical) and 1.16 (lumbar)."   (ECF No. 12, PageID.982).   However, the ALJ's decision that Plaintiff did not meet either listing is supported by substantial evidence. Listing 1.15 is for "[d]isorders of the skeletal spine resulting in compromise of a nerve root(s)" and Listing 1.16 is for "[l]umbar spinal stenosis resulting in compromise of the cauda equina (see 1.00G)."   20 C.F.R. § Pt. 404, Subpt. P, App. 1.   Both require finding an

> Impairment-related   physical   limitation   of   musculoskeletal functioning that has lasted, or is expected to last, for a continuous period of at least 12 months, and medical documentation of at least one of the following:
>
> > 1.   A documented medical need (see 1.00C6a) for a walker, bilateral canes, or bilateral crutches (see 1.00C6d) or a

wheeled and seated mobility device involving the use of both hands (see 1.00C6e(i)); or

2. An inability to use one upper extremity to independently initiate, sustain, and complete work-related activities involving fine and gross movements (see 1.00E4), and a documented medical need (see 1.00C6a) for a one-handed, hand-held assistive device (see 1.00C6d) that requires the use of the other upper extremity or a wheeled and seated mobility device involving the use of one hand (see 1.00C6e(ii)); or

3. An inability to use both upper extremities to the extent that neither can be used to independently initiate, sustain, and complete work-related activities involving fine and gross movements (see 1.00E4).

20 C.F.R. § Pt. 404, Subpt. P, App. 1.15, 1.16

Plaintiff does not meet any of those requirements. As explained by the ALJ,

> The medical record does not establish that the claimant is unable to use one upper extremity to independently initiate, sustain, and complete work-related activities involving fine and gross movements, along with a documented medical need for a one-handed, hand-held assistive device that requires the use of the other upper extremity or a wheeled and seated mobility device involving the use of one hand. Further, the claimant has not displayed an inability to use both upper extremities to the extent that neither can be used to independently initiate, sustain, and complete work-related activities involving fine and gross movements or a documented medical need for a walker, bilateral canes, or bilateral crutches or a wheeled and seated mobility device involving the use of both hands (B10F; B15F/16; B16F/17; B17F/5).

(PageID.45, citing PageID.625-633, 668, 694, 704).

The record substantially supports the ALJ's findings above, all of which have already been discussed by the Court in this opinion. For example, the ALJ cited Dr. Karnik's August 2018 exam, which found that Plaintiff's range of motion in her left and

20

right upper extremities was normal.  (*Supra* at 10; PageID.45, citing PageID.631) ("right upper extremity; ROM – right shoulder: a normal exam; ROM – right elbow: a normal exam; ROM – right wrist: a normal exam; left upper extremity; ROM – left shoulder: a normal exam; ROM – left elbow: a normal exam; ROM – left wrist: a normal exam;") (emphasis in original).  The exam also found Plaintiff had a "normal gait," with a "normal exam" for tandem, toe, and heel walking.  (PageID.631).  As a result of his exam, Dr. Karnik wrote that Plaintiff had "[n]o physical limitations at this time."  (PageID.632).

Attached to Dr. Karnik's exam is a physical evaluation completed on the same day and by the same practice as Dr. Karnik's, but by a physician who can't be identified because his signature is illegible.  (PageID.626-29).  The ALJ also cited this to support her conclusion that Plaintiff didn't meet the listings.  This report found that Plaintiff had a "slow shuffling gate," but that "clinical evidence" did not "support the need for a walking aid."  (PageID.629).  The same report also showed that Plaintiff had 5/5 grip strength and full range of motion in both upper extremities.  (PageID.626-29).  The ALJ also cites Dr. Radden's examination in July of 2020, in which he wrote, "Neurologic exam is 5/5 in the bilateral upper extremities with deltoid, biceps, triceps, wrist flexors, wrist extensors, finger flexors, finger extensors and intrinsics" and "5/5 in the bilateral lower extremities with hip flexors, quadriceps, tibialis anterior., EHL and gastroc/psoas complex." (PageID.694).  In addition to those exams, the ALJ consistently demonstrated in the RFC that Plaintiff had the ability to use her upper extremities, and Plaintiff cites no evidence that she has an inability to use her hands or that she needs an assistive walking device. Thus, the ALJ's conclusion that Plaintiff does not meet or otherwise equal Listing 1.15 or

21

1.16 is supported by substantial evidence.

## V.      Conclusion

For the foregoing reasons, **IT IS ORDERED** that the Commissioner's Motion for Summary Judgment **(ECF No. 15)** is **GRANTED**, Plaintiff's Motion for Summary Judgment **(ECF No. 12)** is **DENIED**, and that pursuant to sentence four of 42 U.S.C. § 405(g), the ALJ's decision is **AFFIRMED**.

**IT IS SO ORDERED.**

Dated: June 10, 2026                                         s/David R. Grand
Ann Arbor, Michigan                                         DAVID R. GRAND
                                                                          United States Magistrate Judge

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on June 10, 2026.

                                                                  s/Eddrey O. Butts
                                                                  EDDREY O. BUTTS
                                                                  Case Manager

22